IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 14-154 |
| | ) | Judge Nora Barry Fischer |
| TONY GAY, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

I. INTRODUCTION

Presently before the Court is a motion to suppress evidence filed by Defendant Tony Gay on November 11, 2014. (Docket No. 25).[1] The Government opposes said Motion. (Docket No. 32). Pre-hearing briefs were submitted by both parties and a suppression hearing was held on April 9, 2015. (Docket Nos. 32, 38, 39). The transcript of said hearing has been produced and fully considered by the Court. (Docket No. 43). The Court also ordered the parties to submit proposed findings of fact and conclusions of law and responses to same. (Docket Nos. 40, 46). Defendant filed his Proposed Findings of Fact and Conclusions of Law on June 15, 2015. (Docket No. 44). The Government filed its Proposed Findings of Fact and Conclusions of Law on June 16, 2015. (Docket No. 45). Both parties filed responsive briefing on June 29, 2015. (Docket Nos. 47, 48).

Upon consideration of the parties' submissions, the evidence presented during the motion hearing and for the following reasons, the Court will deny all of Defendant's motions.

II. BACKGROUND

---

[1] Also pending are Defendant's Motion for Production of Exculpatory Evidence and Impeachment Evidence, (Docket No. 24), and Defendant's Motion to Produce Evidence which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609, (Docket No. 26). The Court disposes of those Motions in a separate Order.

1

a. *Findings of Fact*

The credible evidence offered at the April 9, 2015 suppression hearing, including the testimony of Parole Officer Michelle Contis and Parole Supervisor Timothy Wolfe[2] and the presented documentary evidence, established the following facts.

Defendant is charged by way of indictment with: (1) possession with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(i); (2) possession of a firearm after having been previously convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e); and (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Docket No. 1). The indictment alleges that Defendant was previously convicted of three counts of manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance on September 20, 2011 in the Court of Common Pleas of Allegheny County. (Docket No. 1).

On January 28, 2013, Defendant was paroled from the Pennsylvania Department of Corrections after serving his sentences in the above referenced cases. (Tr. 8:5–8);[3] (*see also* Docket No. 44 at ¶4). His case was assigned to Parole Officer Michelle Contis[4] of the Pennsylvania Board of Probation and Parole. (Tr. 5:2–3; 8:5–8); (*see also* Docket No. 44 at ¶7). As a parolee, Defendant was subject to certain conditions of release. (Tr. 8:13–17 ); (*see also* Docket No. 44 at ¶ 10). Amongst Defendant's conditions are the following:

---

[2] It is well-settled that at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Hill*, Cr. No. 07-371, 2008 WL 2367185, *5 (W.D. Pa. 2008) (quoting *United States v. Richardson,* 501 F.Supp.2d 724, 734 (W.D.Pa.2007) (citations omitted)).

[3] All references to "Tr." refer to the Redacted Transcript of the April 9, 2015 Suppression Hearing at Docket No. 43.

[4] At the time of the Suppression Hearing, Officer Contis had worked for the Pennsylvania Board of Probation and Parole for seven years. (Tr. 5:2–3). Her training included an initial eight-week course at the Department of Corrections Academy, as well as 40 hours of additional annual training. (Tr. 6:1–15; 11:22–15:1).

- "Effective 1/30/13 your nightly curfew is from 8:00 p.m. to 6:00 a.m.;" (Ex. 2); [5] (Tr. 18:22–19:6);

- "You will not use, possess or control any illegal drug or controlled substances unless it has been prescribed for you by a licensed physician and is in its original container with the prescription affixed on it. You will not be present at or frequent any place where such illegal drugs or controlled substances are sold, kept or used;" (Ex. 2); (Tr. 20:11–17);

- "You are not to possess any drug paraphernalia as described by the Controlled Substance, Drug, Device and Cosmetic Act;" (Ex. 2); (Tr. 20:20–21);

- "You are restricted from any use of a motor vehicle without a valid drivers' license and insurance;" (Ex. 2); (Tr. 23–24);

- "'NO GANG ACTIVITY' You are prohibited from associating with, meeting with, talking to, contact with, or communication with current or former members of any gangs or gangs with whom you have ever associated or been affiliated. You will not wear or display any gang colors or paraphernalia," (hereinafter, the "Gang Condition"); (Ex. 2); (Tr. 21:2–6); and

- "Do not meet or communicate with persons who you know, or should know, have ever been criminally charged with a controlled substance offense, or who use, possess or sell controlled substances without license or prescription to do so." (Ex. 2); (Tr. 22:8–11).

Although the Gang Condition is listed as a "Special Condition of Parole," it is imposed

---

[5] References to "Ex." Refer to the evidence introduced by the parties at the April 9, 2015 Suppression Hearing and can be located as attachments to the Court's Minute Entry from said proceeding at Docket No. 39.

on all individuals who are paroled, and was not imposed for any reason specific to Defendant's history or circumstances. (Tr. 136:9–18).

In addition, Defendant executed the following as a condition of his parole:

> I expressly consent to the search of my person, property and residence, without a warrant, by agents of the Pennsylvania Board of Probation and Parole. Any items, the possession of which constitutes a violation of parole, shall be subject to seizure, and may be used as evidence in the parole revocation process.

(Docket No. 32-1 at 2). Following the above paragraph is Defendant's signature. (*Id.*).

From the commencement of Defendant's supervision until November 5, 2013, a period of approximately nine-and-one-half months, Defendant did not commit any infractions of his parole conditions. (Tr. 29:11–21). During that time, Officer Contis did not receive any information or evidence that Defendant was affiliated with a gang, had drugs in his house, or was involved in the drug trade. (Tr. 52:9–25; 59:17–20; 61:163–18; 73:18–74:9).

On a daily basis, Officer Contis receives reports complied by the City of Pittsburgh Police, which contain information from police complaints and any police contact. (Tr. 30:2–16). Among the reports are daily briefs from the Pittsburgh Bureau of Police Criminal Intelligence Unit. (Tr. 30:2–16). These briefs serve as a source of information for parole officers to track the activities of their parolees. (Tr. 96:25–6). Parole officers regularly rely on the briefs in the course of supervising their parolees. (Tr. 126:24–127:2). The Criminal Intelligence Unit that prepares these briefs is made up of police detectives, at least some of whom provide training and presentations at gang conferences attended by parole officers. (Tr. 128:1–129:11).

Officer Contis and her supervisor, Timothy Wolfe,[6] have previously identified violations

---

[6] At the time of the Suppression Hearing, Timothy Wolfe has worked for the Pennsylvania Board of Probation and Parole for 17 years. (Tr. 91:12–13). At the relevant time, he was a parole supervisor, the position he had been in for seven years. (Tr. 91:16–18). As a parole supervisor, Wolfe supervises eight parole agents working in north

of conditions committed by other supervisees and conducted searches of their residences based on information contained in these briefs. (Tr. 45:8–12; 107:5–12). Officer Contis and Supervisor Wolfe rely on the information set forth in these briefs and have no reason to question their veracity. (Tr. 49:8–11; 129:12–14).

On November 5, 2013, Officer Contis read the Pittsburgh Bureau of Police Criminal Intelligence Unit Daily Intelligence Brief from November 4, 2015 (hereinafter the "Brief"). (Tr. 30:2–16; 32:18–25). Of relevance, the Brief included the following paragraph:

> **ZONE 3**
>
> (LES ) On 11/2/13 at 0031 hrs, Detail Officers conducted a traffic stop on a **2013 tan Chevy Tahoe OH reg. FXT4855** occupied by the driver **Northview Heights Crips** member **Tony GAY** (BM DOB [redacted]), front passenger **Tawain CLARK** (BM DOB [redacted]) and rear passenger **Northview Heights Crips** member **Brian PINKNEY** (BM DOB [redacted]). **CLARK** and **PINKNEY** admitted they had marijuana in the vehicle. ROs recovered from **CLARK** a blunt, a burnt marijuana roach and $2925. ROs recovered from **PINKNEY** a small baggie of marijuana. **GAY** does not have a valid license and the vehicle was towed. **CLARK** and **PINKNEY** were advised of the summons process. (CCR # 13-220273)

(Ex. 3); (Tr. 32:18–33:18).

Upon reading the Brief, Officer Contis identified multiple violations of Defendant's conditions of parole, including being out past curfew; driving without a valid license; being with purported gang members; and being in the presence of illegal drugs. (Tr. 33:20–34:6). Officer Contis believed that the information contained within the Brief indicated that Defendant might be engaged in illicit activity. (Tr. 34:19–22). Specifically, the facts that Defendant was identified as a gang member, was with another individual identified as a gang member, and the

---

Allegheny County. (Tr. 91:20–22). Prior to becoming a supervisor, Wolfe was a parole officer for ten years. (Tr. 25).

amount of cash recovered caused concern. (Tr. at 34:23–35:2). The amount of cash concerned Officer Contis because she believed that it suggested drug dealing activity. (Tr. 35:3–6). Officer Contis also explained that the facts that Defendant was driving after hours without a license was concerning because "[g]enerally, when we identify one of our parolees driving and they don't have a license, there's more to follow." (Tr. 35:7–14). The combination of these facts with Defendant's background (*i.e.*, his charges for possession with intent), as reported in the Brief, caused Officer Contis to believe that Defendant may have been engaged in the drug trade as of the time of the Brief. (Tr. 35:15–36:3; 76:1–25).

Officer Contis then met with Supervisor Wolfe and advised him of the Brief's contents and the conclusions she drew therefrom. (Tr. 97:15–19). Officer Contis and Supervisor Wolfe discussed Defendant's case file, status, conditions of release, and the relevance of the Brief's contents to those conditions. (Tr. 97:22–98:7). Like Officer Contis, Supervisor Wolfe recognized various violations of Defendant's conditions of parole. (Tr. 98:18–21). Based on the information contained in the Brief, Supervisor Wolfe was concerned with the possibility that there may be drug paraphernalia at Defendant's residence. (Tr. 100:12–15; 100:20–25). Additionally, Supervisor Wolfe found "very concerning" the Brief's report that Defendant was involved in a gang and was found with a gang member. (Tr. 101:1–11). Supervisor Wolfe has had experience in his career in locating evidence of gang membership or affiliation during parole searches, such as pictures of individuals displaying gang signs, papers with coded membership lists, signs and insignia depicted on the walls of the home, and specifically colored clothing. (Tr. 101:12–103:16). Again, Officer Contis and Supervisor Wolfe rely on the information set forth in these briefs and have no reason to question their veracity. (Tr. 49:8–11; 129:12–14). Thus, neither conducted additional research to determine the truth of the Brief. (Tr. 59:4–11; 133:9–

16).

According to Officer Contis and Supervisor Wolfe, the information contained within the Brief alone would have been sufficient to support an arrest of Defendant. (Tr. 37:8–16; 68:2–6; 77:7–22; 98:18–21). However, when a supervisee violates conditions of release, the parole office typically conducts a subsequent search of his or her residence, (Tr. 77:15–18:12), and, given Defendant's past and the information contained in the Brief, Supervisor Wolfe felt such a search would be important to get a "full picture" of the Defendant's conduct. (Tr. 98:22–99:21).

Based on their conclusions, Supervisor Wolfe ordered that Defendant's residence be searched. (Tr. 95:5–99:21). The search, known as a "compliance check," was conducted the following day, November 6, 2013, at a time when Defendant was already due to report to the parole office. (Tr. 104:4–6). A compliance check is performed to determine whether a supervisee is in compliance with the conditions of his supervision or, when there is already evidence of violations, whether additional evidence of violations exists. (Tr. 61:1–20; 98:22–99:17; 104:10–12). In ordering the search, Supervisor Wolfe considered the factors outlined in 61 P.S. § 331.27a,[7] the statute governing searches by state parole agents. (Tr. 104:17–106:10). Specifically, Supervisor Wolfe considered the following factors: the defendant was on parole for drug convictions; the activities of the defendant were violations of the conditions of his parole; the information about these violations was obtained from another law enforcement agency; Supervisor Wolfe had past experience in discovering evidence of additional violations and crimes when acting on information from the Daily Intelligence Brief; and parole agents have a duty to ensure the defendant's compliance with the provisions of his parole. (Tr. 106:11–107:20).

When Defendant arrived at the parole office on November 6, 2013, he did not volunteer

---

[7] While Supervisor Wolfe discussed 61 P.S. § 331.27a, that statute was repealed and replaced with 61 Pa.C.S.A. § 6153, effective October 13 2009. The factors to be considered are identical.

information about the police encounter reported in the Brief until after Officer Contis told him she know about it. (Tr. 38:12–15). Officer Contis then handcuffed Defendant and placed him in a holding cell. (Tr. 38:3–4). Officer Contis and Supervisor Wolfe, joined by several other parole officers, transported Defendant, handcuffed, to his residence. (Tr. 39:14–17). Upon arriving at the residence, the team knocked on the door, but got no response. (Tr. 39:22–23). Defendant did not have his key with him. (Tr. 38:18–25). The team could not find a hidden spare, (Tr. 39:23–25), nor were they able to reach his mother, (Tr. 39:25–40:1), and the remaining doors and windows were locked, (Tr. 40:2–4). Accordingly, the team removed a board over a window and sent an agent through the window who then unlocked the front door. (Tr. 40:3–19).

Officer Contis and Supervisor Wolfe began to search what they previously knew to be Defendant's bedroom. (Tr. 41:10–20). When searching the closet, Officer Contis found a firearm concealed in a purse. (Tr. 42:2–8). Officer Contis also located whet she suspected to be heroin in another bag in the closet. (Tr. 42:8). Supervisor Wolfe also located suspected heroin within another bag. (Tr. 42:9–10). Because they had uncovered evidence of possible criminal misconduct, rising above the level of mere technical violations of Defendant's conditions of parole, Supervisor Wolfe then called the Pittsburgh Police. (Tr. 44:3–9; 111:19–112:18).

When the Pittsburgh Police arrived, Officer Contis and Supervisor Wolfe showed the police what they found and where they found it. (Tr. 44:10–15). The police met with Defendant outside the presence of the team from the parole office. (Tr. 44:16–17). The police then took custody of Defendant, whereupon they obtained a search warrant. (Tr. 44:19–22).

The Court now turns to its analysis of Defendant's Motions.

III. DISCUSSION

    *a. Suppression*

At the outset, the Court finds that Defendant has met his initial burden to establish a colorable basis for the instant motion to suppress because it is undisputed that the officers executed a warrantless search of Defendant's residence, potentially implicating his Fourth Amendment rights to be free from such warrantless searches. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citing *United Sates v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993)). Therefore, the burden shifts to the Government to show that the search was reasonable and consistent with applicable Fourth Amendment jurisprudence. *Id.* ("once the defendant has established a basis for his motion *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable.").

The Fourth Amendment provides, in pertinent part, that people have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. Generally, the Fourth Amendment mandates that government officials must establish probable cause and obtain a warrant prior to conducting a search or seizure. *Id.* ("no Warrants shall issue, but upon probable cause"). One well-established exception to the warrant requirement is the parole/probation exception. The Supreme Court has recognized that individuals who are released on probation "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). The United States Court of Appeals for the Third Circuit has extended the reasoning of *Griffin* to parolees. *See United States v. Hill*, 967 F.2d 902, 909 (3d Cir. 1992) (holding that "*Griffin's* reasoning applies equally to the parole system"). In the cases brought against parolees or probationers, "the requisite level of suspicion is reduced and a warrant is not required" if "reasonable suspicion" exists to conduct a warrantless search or

9

seizure. *United States v. Baker*, 221 F.3d 438, 443-44 (3d Cir. 2000). The Court of Appeals has explained that the reasonable suspicion standard is a:

> less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). The Court of Appeals has also recognized that the reasonable suspicion standard is applied in cases such as this one wherein the Defendant voluntarily executes the standard Pennsylvania consent form, authorizing warrantless searches of his approved residence by parole officers. *See Baker*, 221 F.3d at 448 ("we conclude that Pennsylvania would construe the consent form to include an implicit requirement that any search be based on reasonable suspicion.").

In the Commonwealth of Pennsylvania:

> The reasonableness of suspicion to search [a parolee] shall be determined in accordance with constitutional search and seizure provisions as applied by judicial decision. In accordance with such case law, the following factors, where applicable, may be taken into account:
> (i) The observations of agents.
> (ii) Information provided by others.
> (iii) The activities of the offender.
> (iv) Information provided by the offender.
> (v) The experience of agents with the offender.
> (vi) The experience of agents in similar circumstances.
> (vii) The prior criminal and supervisory history of the offender.
> (viii) The need to verify compliance with the conditions of supervision.

61 Pa. Cons. Stat. Ann. § 6153(d)(6). The second factor, "information provided by others," includes information that is received from other law enforcement officials during the course of

an investigation, which is generally presumed to be reliable. *See United States v. Yusuf*, 461 F.3d 374, 385 (3d Cir. 2006) (citing *United States v. Ventresca*, 380 U.S. 102, 111 (1965)).

This Court must look at the "totality of the circumstances' of each case to see whether the officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). This type of determination permits "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (citing *Cortez*, 449 U.S. at 418). Accordingly, the burden is on the Government to prove that Officer Contis had reasonable suspicion that Defendant had engaged in criminal conduct or committed a parole violation prior to executing the warrantless search of his residence. *See Johnson*, 63 F.3d 242 at 245 (citation omitted). If the Government does not establish reasonable suspicion for the search, the search is illegal and any evidence obtained by law enforcement as a result of the unlawful search must be suppressed as the "fruit of the poisonous tree."[8] *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006); *see also Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (citation omitted).

In this case, Defendant argues that, based on the totality of the circumstances, the state parole officers lacked reasonable suspicion to search Defendant's residence. (Docket No. 25). His argument basically is that the Brief did not provide adequate and/or sufficiently reliable information to support particularized facts to justify the decision to search Defendant's residence, as the search was carried out as a matter of course upon discovering Defendants' violations contained within the Brief. (*Id.*). Defendant also repeatedly points out that neither

---

[8] However, the Supreme Court has held that the "the federal exclusionary rule does not bar the introduction at parole revocation hearings of evidence seized in violation of parolees' Fourth Amendment rights." *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 363 (1998).

Officer Contis nor Supervisor Wolfe performed an independent investigation into the Brief's statement that Defendant was a gang member. (*See, e.g.*, Docket No. 44 at ¶¶ 28, 38, 49, 51). The Government responds that the Brief did provide an adequate factual basis to support the search of Defendant's residence. (Docket No. 32). It further argues that the Brief is presumptively reliable, thus removing any obligation for Officer Contis or Supervisor Wolfe to confirm its veracity. (Docket No. 48 at 2 (citing *Yusuf*, 461 F.3d 374)).

The Court is unconvinced by Defendant's arguments and finds that the Government has met its burden to establish reasonable suspicion to justify the search of Defendant's residence. The Court's analysis follows.

Initially, the Court agrees with the Government that the Brief may claim benefit to the presumptive reliability bestowed by *Yusuf*. It is clear that the brief constitutes "information received from a sister governmental agency," *Yusuf*, 461 F.3d at 374, as it was compiled by a unit of the City of Pittsburgh Bureau of Police. (*See* Tr. 30:2–16). Thus, it is presumptively reliable unless the Defendant establishes "that the officer acted recklessly by submitting evidence: (1) of a systemic failure on the agency's part to produce accurate information upon request; or (2) that the officer's particular investigation into possibly inaccurate information should have given the officer an obvious reason to doubt the accuracy of the information." *Yusuf*, 461 F.3d at 378. Defendant has adduced absolutely no evidence supporting either prong. Given same, it was appropriate for Officer Contis and Supervisor Wolfe to rely upon the information contained within the Brief.[9]

Having so held, the information learned from the Brief and pointed out by Officer Contis and Supervisor Wolfe as supporting their decision to search Defendant's house, when viewed

---

[9] Indeed, the Court questions what other investigation Officer Contis or Supervisor Wolfe *could* have undertaken regarding Defendant's reported gang membership short of searching his residence.

collectively, is ample to support a finding of reasonable suspicion. Officer Contis testified that the allegation that Defendant was a gang member,[10] that he was with another individual identified as a gang member, that there was a large amount of cash, and that Defendant was driving after hours without a license, combined with his criminal background, all factored into her decision making process. (Tr. 34:23–25:2). Further, Supervisor Wolfe testified that the information in the Brief, combined with the defendant's specific criminal history, and Supervisor Wolfe's experience guided his decision to order the search. (Tr. 106:11–107:20). While, individually, these factors may not support a finding of reasonable suspicion, given the totality of the circumstances, the Court finds that they do.

The totality of the circumstances in this case are distinguishable from those in the cases Defendant cited in support of his Motion. In *Shackelford*, the parole officer "had decided before he arrived for his field visit at Shackelford's home that he was going to search Shackelford's bedroom for his own safety." *United States v. Shackelford*, Crim. No. 04-192, at 4 (W.D. Pa. June 3, 2005) (unreported slip opinion). Further, Shackelford's parole officer "testified that it was finding a firearm at another parolee's home, totally unrelated to Shackelford, that triggered a concern for his safety when conducting field visits." (*Id.* at 8). Contrarily, Officer Contis and Supervisor Wolfe reviewed Defendant's file and the Brief – both of which contain information specific to Defendant – before making the decision to search his residence.

In *Rivera*, the Defendant drove to a meeting with his parole officer, at which he admitting to spending time with people that were using marijuana, a violation of his conditions of parole.

---

[10] The Court does not find that Defendant was, in fact, a member of the Northview Heights Crips, as reported in the Brief. Whether or not Defendant is a gang member is not of moment at this stage of the proceedings. (*See also* Docket No. 48 at 4 n.1 ("[T]he [G]overnment is not claiming that Gay or Pinkney are necessarily gang members.")). It merely finds that reliance on the report of gang membership in this case is an appropriate basis in determining reasonable suspicion. *See United States v. Korey*, Crim. No. 14-108, 2015 WL 737628, at *14 (W.D. Pa. Feb. 20, 2015) (Conti, CJ).

*United States v. Rivera*, 727 F.Supp.2d 367, 369 (E.D. Pa. 2010). Following this, the parole officer searched the car Defendant drove to the meeting, including its trunk. *Id.* When asked why she searched his car, the officer responded that it was primarily because Rivera was not permitted to drive. *Id.* at 370. There, the court found that, while the parole officer "told us "that led [her] to believe that something else other—else is going on with Mr. Rivera, . . . [s]he did not explain what that 'something else' was, and reasonable suspicion requires more than amorphous concerns about the way a parolee acts or behaves." *Id.* Here, on the other hand, Officer Contis and Supervisor Wolfe identified the information from the Brief and the Defendant's file they considered. (Tr. 34:19–36:3; 106:11–107:20). Hence, the search was not conducted solely as a result of a driving violation.

In *Baker*, the defendant drove to a scheduled meeting with his parole officer. *United States v. Baker*, 221 F.3d 438, 440 (3d Cir. 2000). During the visit, it came out that Baker did not have a valid driver's license. *Id.* Thus, when Baker attempted to drive away after his visit, parole officers arrested him for violating a condition of his parole (*i.e.*, that he not drive without a valid driver's license). *Id.* After his arrest, parole officers searched the passenger compartment, glove box, and trunk of his vehicle. *Id.* at 440–41. In the trunk, the officers located suspected drug paraphernalia. *Id.* at 441. The Third Circuit found that the officers lacked reasonable suspicion to search the trunk as their "actions were not based on 'specific facts' giving rise to suspicion that there would be some evidence of a further violation of parole in the trunk." *Id.* at 444 (citing *United States v. Hill*, 967 F.2d 902, 911 (3d Cir. 1992)). While one of the violations Defendant amassed in the instant case was, like Baker, driving without a valid driver's license, Officer Contis and Supervisor Wolfe pointed to specific facts presented in the Brief that, when combined with Defendant's history, rise to the level of reasonable suspicion.

Finally, Defendant cites this Court's decision in *United States v. Perminter*, Crim. No. 10-204, 2012 WL 273349 (W.D. Pa. Jan. 30, 2012) (Fischer, J). There, the Court suppressed evidence against Perminter that was located in a search of his residence performed solely on the basis of "a bare anonymous tip." *Id.* at *12. The Court also held that a supervisee's "criminal record is not, in and of itself, sufficient to bolster the reliability of an anonymous tip to the level of establishing reasonable suspicion." *Id.* Officer Contis and Supervisor Wolfe, however, relied upon the Brief from the City of Pittsburgh Bureau of Police – a reliable source – to support their decision to search Defendant's residence. As the Court has already determined that the Brief is entitled to a presumption of reliability per *Yusuf* and that Defendant has not rebutted same, the instant case is clearly distinguishable from *Perminter*.

IV. CONCLUSION

Finding the Government's arguments more persuasive given the facts and circumstances of this case, the Court is not convinced by Defendant's arguments, his Motion to Suppress shall be denied. An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: July 27, 2015

cc/ecf: All counsel of record.

Tony Gay, c/o Jay Finkelstein, AFPD